UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:17-cr-11-SRN-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Terrence Christian Garmon, | |
| Defendant. | |

The government has charged Terrence Christian Garmon with five counts of bank robbery. [Indictment, ECF No. 1.] Currently pending before the Court are Mr. Garmon's motions to suppress evidence he alleges was obtained in violation of his Fourth Amendment rights. [Mot. to Suppress, ECF No. 22; Am. Mot. to Suppress, ECF No. 32.] Mr. Garmon asserts that on April 7, 2016, police stopped a vehicle in which he was a passenger without probable cause or reasonable suspicion, requiring suppression of the evidence they later seized from the car. He also argues that the Federal Bureau of Investigation unreasonably executed a search warrant for the contents of his cellular phone after the warrant had expired. And finally, Mr. Garmon asserts that cell tower evidence obtained by the government must be suppressed because the corresponding search warrant and court order were tainted with unlawfully seized evidence.

The Court held a hearing on Mr. Garmon's motions on January 18, 2018, and three witnesses testified for the government. [Hr'g Mins., ECF No. 38.] In addition to the testimony, nine exhibits were admitted into evidence. [*See* Ex. List, ECF. No. 39.] The parties filed post-hearing memoranda. [Def.'s Mem., ECF No. 43; Gov't's Resp., ECF No. 46; Def.'s Reply, ECF No. 49; Gov't's Suppl. Resp., ECF. No. 50.] Based on the entire record and for the reasons set forth below, the Court recommends that Mr. Garmon's suppression motions be denied.

**I.      The Traffic Stop And Search Of The Backpack**

Mr. Garmon first challenges an April 7, 2016 traffic stop conducted by St. Paul Police Officers Christopher Hanson and Michael Matsen. He contends that all the evidence obtained during that traffic stop must be suppressed because the officers lacked legal justification to justify the stop. He also argues that, even if the stop was lawful, the officers unreasonably searched a backpack they found inside the vehicle. [Def.'s Mem. at 8-18.]

**A.      Factual Findings**

Between January and the end of March in 2016, a series of bank robberies occurred in the Twin Cities. Each robbery involved a similar modus operandi and appeared to have been carried out by the same individual. The suspect targeted bank branches located inside grocery stores, and in each incident, he had entered the bank, approached the teller, presented a note, and demanded money. The suspect was identified as a "[b]lack male (. . . described as possibly being Somali), approximately 24 to 32 years old, approximately 6 [feet] tall, approximately 140 pounds, [with a] thin to medium build . . . ." [Gov't's Ex. 2 at 2.]

FBI Special Agent David Walden began investigating this string of bank robberies in early 2016. He obtained several still images of the suspect from surveillance video taken inside the banks and footage from a camera outside of a Target that was located near one of the banks. The Target video led Agent Walden to believe that a silver or metallic colored Lincoln Town Car from the mid-1990s was connected to the suspect.

On April 6, 2016, Agent Walden prepared a memorandum referred to as a Metro Regional Information Center Information Alert ("MRIC Alert"). In the MRIC Alert he included a description of the suspect, still images of the suspect from several of the bank robberies, and a picture of the Lincoln Town Car. Agent Walden distributed the MRIC Alert by e-mail to law enforcement agencies throughout the

metro area so that local officers could assist in the investigation and be on the lookout for the suspect or the vehicle.

On April 7, 2016, at their department's morning briefing, St. Paul Police Officers Hanson and Matsen received the MRIC Alert in hard copy and by e-mail. Later that day, the officers were patrolling near the intersection of Forest Street and Case Avenue on the east side of St. Paul. While approaching the intersection heading south, the officers saw a Lincoln Town Car that closely resembled the vehicle depicted in the MRIC Alert. The Lincoln passed in front of the officers heading west on Case, so Officer Hanson turned west on Sims Avenue to travel parallel to the Lincoln one block to the south. At the next intersection, the officers saw that the Lincoln had turned north on Mendota Street, and they turned to follow it.

Both Officer Hanson and Officer Matsen testified that they believed that the Lincoln was exceeding the 30-miles-per-hour speed limit. The Lincoln had quickly travelled several blocks north on Mendota Street. The officers concluded that it must have been speeding to have covered so much distance. Officer Hanson, who was driving the squad vehicle, increased his speed to at least 39 miles per hour to catch up to the Lincoln. [Def.'s Ex. 1 at 12:18:40 (showing squad speed at 39 mph).]

During their pursuit, Officer Matsen ran the Lincoln's license plate through the computer assisted dispatch system in the squad car. He originally entered an incorrect plate number, resulting in erroneous information that the vehicle had an expired registration.[1] As the squad car got closer to the Lincoln, the Lincoln activated its turn

---

[1]   Officer Matsen did not realize his mistake until after the vehicle had already been stopped. However, this fact is not material to the Court's decision because the government does not rely in any way on the officers' mistaken but temporary belief that the car was unregistered to justify the stop. [*See* Gov't's Resp. at 5-8 (asserting that the officers had probable cause to believe the Lincoln was speeding and reasonable suspicion to believe that the vehicle might be involved in the bank robberies).]

signal, abruptly pulled over to the side of the road and stopped. Officer Hanson pulled the squad car in behind the Lincoln and activated the lights.

There were four occupants in the Lincoln. Officer Hanson approached the driver's side of the vehicle and spoke to the driver, Mr. MacDonald, while Officer Matsen approached the passenger side of the vehicle. Mr. MacDonald told Officer Hanson that the vehicle belonged to his fiancée and that he was not a licensed driver. Mr. MacDonald also told Officer Hanson that Mr. Garmon, who was seated in the front passenger seat, had a valid driver's license. The officers took licenses or identification cards from Mr. MacDonald and Mr. Garmon and went back to the squad car. Officer Hanson checked their information on the squad car computer and confirmed that Mr. MacDonald had no valid license, but Mr. Garmon did. However, Officer Hanson also learned that Mr. Garmon had an outstanding misdemeanor warrant out of Hennepin County for an uninsured vehicle.

Because the officers believed that Mr. Garmon and the Lincoln resembled the images they had seen earlier that morning in the MRIC Alert, they next pulled up the MRIC Alert in the squad car's computer. They were able to zoom in on the picture of the suspect's vehicle. The officers were unable to spot comparable areas of what appeared to be rust between the image and the Lincoln, but they nevertheless became more confident they had a match. The suspect vehicle in the MRIC Alert images and the Lincoln they stopped both had an area of discoloration on the passenger side rear-view mirror and a missing center hub cap on the rear passenger side wheel.

Officers Hanson and Matsen understood that they had discretion to choose whether arrest Mr. Garmon for the outstanding misdemeanor warrant. Officer Hanson decided that Mr. Garmon should be arrested on the warrant because he resembled the bank robbery suspect and the Lincoln was a match to the suspect vehicle. Officer Matsen then brought Mr. Garmon back to the squad car and told him that he was being arrested on the outstanding warrant. Mr. Garmon was handcuffed

4

and placed in the back of the squad car. When he patted Mr. Garmon down, Officer Matson recovered a black Nokia cell phone.[2]

Officer Matsen had seen a black backpack at Mr. Garmon's feet on the front passenger seat floorboard in the Lincoln. He asked Mr. Garmon if the backpack belonged to him, which Garmon denied. Officer Matsen believed that Mr. Garmon was lying because the backpack was in the area of his immediate control when he was in the car prior to his arrest. Officer Matsen retrieved the backpack and searched it. He also seized a black coat that he saw on the floorboard in the back seat of the Lincoln, which matched one worn by the suspect in the MRIC Alert.

The entire traffic stop took almost an hour and a half. Because Officers Hanson and Matsen were convinced that Mr. Garmon was the bank robbery suspect from the MRIC Alert, they attempted to contact the FBI, prolonging the traffic stop. Ultimately the officers decided to take photographs of the vehicle and release it to its owner, who arrived on the scene in time to drive it away. Officers Hanson and Matsen then brought Mr. Garmon to the Ramsey County Law Enforcement Center.

### B.   The Stop Was Reasonable

Mr. Garmon argues that the warrantless stop of the Lincoln was unlawful. [Def.'s Mem. at 10-16.] The government contends that the stop was justified despite the absence of a warrant for two reasons: (1) the officers had probable cause to believe the vehicle was speeding; and (2) they had a reasonable suspicion that the Lincoln was involved in the bank robberies. [Gov't's Resp. at 5-8.] Mr. Garmon urges the Court to find that neither of these proffered exceptions to the warrant requirement applies. The Court concludes that the second proffered rationale -

---

[2]   The seizure of the cell phone is challenged in Mr. Garmon's motion regarding the lawfulness of the traffic stop. The search of its contents pursuant to a warrant is discussed below in Part II of this Report and Recommendation.

suspicion that the Lincoln was involved in bank robberies - provided legal justification for the stop.

The Fourth Amendment protects Mr. Garmon's right to be free from unreasonable searches and seizures. U.S. Const., amend IV. A traffic stop is a Fourth Amendment seizure, *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004), and a passenger may challenge a traffic stop's constitutionality, *Brendin v. California*, 551 U.S. 249, 256-59 (2007). When officers observe a traffic violation, they have probable cause to stop the vehicle, making a traffic stop reasonable. *United States v. Walker*, 555 F.3d 716, 720 (8th Cir. 2009) ("[A]ny traffic violation provides probable cause for a traffic stop."). However, because a traffic stop is "an investigative detention, rather than a custodial arrest," *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001), even if police lack probable cause, they can stop a vehicle and briefly detain a person for investigative purposes if they have reasonable suspicion supported by articulable facts the vehicle's occupants may be engaged in criminal activity, *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). To satisfy this lower standard, officers must explain "some minimal, objective justification for an investigatory stop." *Fuse*, 391 F.3d at 929. Whether reasonable suspicion of criminal activity justifies a traffic stop is assessed based on the totality of the circumstances. *See United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017).

In this case, when they initiated the traffic stop, Officers Hanson and Matsen had a reasonable suspicion, supported by articulable facts, that the occupants of the vehicle may have been connected to the bank robberies. The evidence shows that upon first seeing the Lincoln cross their path the officers believed that it resembled the vehicle from the MRIC Alert they had received that very morning. *See United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.") (quoting *United States v. Hensley*, 469

6

U.S. 221, 232 (1985)). This was not a case where the officers had only general, or vague information before conducting the traffic stop. *See Thompson v. Reuting*, 968 F.2d 756, 759-60 (8th Cir. 1992) (concluding that officers lacked reasonable articulable suspicion to stop Mr. Thompson's vehicle where the police received only a report of a suspicious Chevy Nova in a high-crime, low-traffic area, but had no information that the occupants of the car may have committed a crime and otherwise had only general and incomplete information). Instead, they had specific information tying the vehicle and possibly its occupants to a string of bank robberies.

Mr. Garmon raises several arguments in an effort to undermine this basis for the stop. First, Mr. Garmon argues that the stop was unreasonable because the officers did not know a license plate number or exact year for the suspect vehicle, did not recognize any unique identifying features on the Lincoln prior to the stop, and did not have an accurate description of the suspect vehicle's color to compare it to the car they were following. [Def.'s Mem. at 15.] The Court disagrees. While it is true that Officers Hanson and Matsen did not have perfectly detailed information about the suspect vehicle to connect it irrefutably to the Lincoln they saw on April 7, 2016, this does not mean they lacked a reasonable suspicion.

In addition to the similarities between the stopped car and the car depicted in the MRIC Alert, the officers' suspicions were strengthened by the possibly evasive driving conduct they observed when they spotted the vehicle. When the Lincoln passed the intersection of Forest and Case, Officer Matsen saw it accelerate, which he believed was in response to the occupants seeing the squad car. After traveling for a block parallel to the Lincoln, the officers saw that it had turned north onto Mendota and covered a considerable distance in a relatively short time. This also aroused the officers' suspicion because Mendota is quiet residential street rather than a thoroughfare, making it uncommon to see a vehicle travel several blocks at a higher speed. And when the officers caught up to the vehicle on Mendota, the vehicle abruptly signaled and pulled over to the side of the road though Officer Hanson had not yet activated the squad car's lights. "While [an] officer's subjective perceptions of

7

the driver's nervous behavior or evasive driving standing alone may not be sufficient to constitute a reasonable, articulable suspicion, when taken with other factors, they contribute to the suspicion." *United States v. Stachohwiak*, 521 F.3d 852, 856 (8th Cir. 2008); *see also United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) ("[P]olice are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive.")). Under the totality of the circumstances, including the perceived evasive driving and the similarity of the Lincoln to the vehicle in the MRIC Alert, it was reasonable for the officers to conclude that further investigation was warranted.

Second, Mr. Garmon asserts that the officers' testimony and the squad video recording diverge in important respects, undermining both the officers' credibility and the validity of the government's reliance on their purported suspicion. For example, he contends that neither officer can be overheard on the recording referring either to the similarity of the vehicle or to speeding when asked by another officer why they had stopped the Lincoln. [Def.'s Mem. at 3-4 (citing Def.'s Ex. 1 at 12:40:55); *id.* at 10.] He also suggests that the officers lacked the confidence expressed in their hearing testimony that the Lincoln they saw was similar to the car in the MRIC Alert because the recording captures them questioning the strength of the match after the stop was initiated. [*Id.* at 4-5, 15.] This argument is also unavailing.

Having reviewed all the evidence, the Court finds the officers' testimony about the stop and their motivations to be credible. In particular, the squad car recording is consistent with the officers' testimony that after they initiated the traffic stop, they referred back to the MRIC Alert to confirm not only the similarity between Mr. Garmon's appearance and that of the suspect, but also the similarities between the suspect vehicle and the Lincoln.

To the extent Mr. Garmon contends that the stop was unreasonable because the recording demonstrates the officers were not certain that the Lincoln was a match,

such certainty is simply not required for police to conduct an investigative traffic stop. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) ("Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."); *United States v. Lawhorn*, 735 F.3d 817, 821 (8th Cir. 2013) ("Reasonable suspicion does not require absolute certainty; rather an officer must observe unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.").

Finally, Citing *United States v. Roberts*, 787 F.3d 1204 (8th Cir. 2015), Mr. Garmon argues that the absence of direct temporal or physical proximity between the Lincoln and any suspected crime renders the officers' suspicions unreasonable. The Court again disagrees.

In *Roberts*, the court found that a police officer had reasonable suspicion to conduct an investigatory stop of a black Chrysler where the officer was responding to a dispatch to be on the lookout for such a vehicle in connection with a shooting and then saw the vehicle a few blocks away from the scene of the shooting moments after it occurred. The temporal and geographic proximity of the vehicle to the crime contributed significantly to the reasonableness of the officer's conduct. 787 F.3d at 1209-11. The Eighth Circuit has found such temporal and geographic proximity to suspected criminal activity to be an important factor in other cases as well. *See, e.g.*, *United States v. Mosley*, 878 F.3d 246, 252-53 (8th Cir. 2017) (relying on *Roberts* to conclude that officers reasonably stopped a gray Ford Taurus in "close geographic and temporal proximity to [a] robbery"); *Juvenile TK*, 134 F.3d at 904 (considering "the vehicle's temporal and geographic proximity to the crime scenes" as an important part of the reasonable suspicion justifying the vehicle stop). However, the Eighth Circuit has never held that temporal and geographic proximity to reported criminal activity are prerequisites for a finding that a stop was based on reasonable suspicion, instead

uniformly focusing on the totality of circumstances in each case. Had such facts been present here, Officers Hanson and Matsen would have had an even stronger basis to stop the Lincoln; but the information available to the officers at the time they stopped the Lincoln still provided them with far more than a mere hunch to justify their actions.

The Court concludes that the stop of the Lincoln was based on reasonable suspicion, and therefore did not violate Mr. Garmon's Fourth Amendment rights.[3] Mr. Garmon's motion to suppress fruits of the traffic stop should therefore be denied.

### C.   The Search Of The Backpack Was Reasonable

Independent of the legality of the traffic stop, Mr. Garmon asserts that Officer Matsen violated his Fourth Amendment rights when he searched the backpack taken from the front passenger floorboard. Mr. Garmon argues that the search of the backpack was not reasonable under the search-incident-to-arrest doctrine because by the time the search occurred he was in restraints and could not have reached the Lincoln or the backpack. Likewise, he argues there was no reason to believe that evidence relating to his misdemeanor warrant would be found in the bag. [Def.'s Mem. at 16-18.] The government argues that the search of the backpack was justified under the automobile exception [Gov't's Resp. at 8-9], and that Mr. Garmon cannot challenge the search because he had abandoned the property prior to the search by denying that it belonged to him [Gov't's Suppl. Resp. at 1-4].

The Court addresses the abandonment issue first. "The Fourth Amendment is not implicated by a search of property that has been abandoned because a defendant

---

[3]   Because reasonable suspicion supported the stop, the Court need not consider whether the officers also had probable cause to believe that the Lincoln was violating the speed limit, which would provide an independent basis for the stop.

who has abandoned his property has relinquished his reasonable expectation of privacy." *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) (quotations and alterations omitted). The decision of whether property has been abandoned must be made in light of "the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Id.* (quoting *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008)). Abandonment may be shown where the defendant either physically relinquishes property or denies that he owns it. *Id.* (citing *Untied States v. Simpson*, 439 F.3d 490, 494 (8th Cir. 2006)). This issue is determined by the totality of the circumstances. *Id.*

Here, no violation of Mr. Garmon's Fourth Amendment rights occurred because he denied that he owned the backpack prior to the search. The uncontroverted evidence that Mr. Garmon told Officer Matsen that the backpack was not his is sufficient to demonstrate that he abandoned the backpack. *United States v. Sanders*, 196 F.3d 910, 914 (8th Cir. 1999) (concluding that the defendant's statements to the officers that he did not own a maroon bag were sufficient to constitute abandonment); *United States v. Sanders*, 130 F.3d 1316, 1317 (8th Cir. 1997) (same). This is true even if Mr. Garmon later intended to reclaim the backpack. *Nowak*, 825 F.3d at 948 (citing *United States v. Basinski*, 226 F.3d 829, 836-37 (7th Cir. 2000) ("[I]t does not matter whether the defendant harbors a desire to later reclaim an item.")). Nor does it change the Court's conclusion that Officer Matsen believed Mr. Garmon was being untruthful when he denied ownership. *Sanders*, 196 F.3d at 914 ("Even if the Agents knew that Sanders was lying when he claimed not to know anything about the ball of tape and the maroon bag, this Court still must conclude that the property was abandoned.") (citing *Sanders*, 130 F.3d at 1318 (rejecting the defendant's argument that a finding of abandonment was clear error "because officers knew he was lying when he claimed not to own the brown bag")).

In essence, because Mr. Garmon "forfeited his Fourth Amendment guarantee of privacy" when he denied that the bag belonged to him, *Sanders*, 130 F.3d at 1318,

11

his rights were not violated by Officer Matsen's search.[4] His motion to suppress evidence obtained from inside the bag should be denied.

## II.     Execution Of The Cell Phone Search Warrant

When Mr. Garmon was arrested, the officers seized a cell phone from his person. Agent Walden later obtained a search warrant authorizing review of the phone's contents for evidence connecting Mr. Garmon to the bank robberies. But because the phone was locked, its contents were not actually accessed or copied until after the date listed for execution of the warrant.  Mr. Garmon argues that any evidence obtained from the search of the cell phone must be suppressed because its execution was untimely. [Def.'s Mem. at 18-20.]

### A.     Factual Findings

On April 15, 2016, Agent Walden applied for a search warrant authorizing the forensic search of the contents of the black Nokia cell phone originally seized from Mr. Garmon. United States Magistrate Judge Becky R. Thorson signed the warrant in the afternoon of April 15, 2016. The warrant commanded Agent Walden to "execute this warrant on or before April 29, 2016." [Gov't's Ex. 1.]

On April 18, 2016, Agent Walden made a request to the computer analysis response team (CART) to have the phone examined as permitted by the warrant. On April 19, 2016, CART examiner Tony Knutson was assigned to examine the cell phone. Mr. Knutson checked the phone out of evidence storage shortly thereafter, but returned it on April 21, 2016 when he realized he was unable unlock the phone.

On April 25, 2016, after learning about the lock on the phone, Agent Walden sent the phone to the FBI laboratory engineers in Quantico, Virginia, for review by a

---

[4]     Because the Court concludes that the backpack was abandoned, it does not determine the applicability of the exceptions to the warrant requirement for automobile searches or searches incident to arrest.

cryptologic and electronic analysis unit (CEAU). The CEAU lab prioritizes its processing of electronic devices by pending court dates or unique exigent circumstances, and Agent Walden knew that his request for the search of the phone was low priority for the lab. Agent Walden did not ask for an extension of the April 29, 2016 deadline for execution of the warrant.

The lab was ultimately able to unlock the Nokia cell phone and copy its data onto a disc. However, the examination did not occur until August 19, 2016, nearly four months after the April 29, 2016 deadline for execution of the warrant. The CEAU lab returned the phone to Agent Walden on August 30, 2016. Agent Walden waited an additional nine months before submitting the search warrant to a federal magistrate judge on May 30, 2017. [Cell Phone Search Warrant Return (on file with the Court).]

### B.   The Execution Of The Cell Phone Warrant Does Not Require Suppression

Mr. Garmon argues that the FBI's failure to image the Nokia cell phone prior to April 29, 2016 requires suppression of any evidence obtained from the device. He contends that the CEAU lab's copying of the data on the cell phone months later violates the requirement in Federal Rule of Criminal Procedure 41 that a warrant be executed within 14 days of the date it is issued. [Def.'s Reply at 4-6.] The government contends that suppression of the evidence obtained from the phone is inappropriate because Agent Walden complied with the 14-day deadline established by Rule 41, and even if he did not, the government did not exhibit reckless disregard for proper procedure. [Gov't's Resp. at 9-10.]

Rule 41 provides, in part, that a warrant "must command the officer to . . . execute the warrant within a specified time no longer than 14 days. . . ." Fed. R. Crim. P. 41(e)(2)(A)(i). Further, "[t]he officer executing the warrant must enter on it the exact date and time it was executed." Fed. R. Crim. P. 41(f)(1)(A). For a warrant authorizing the seizure of electronic storage media or the seizure or copying of electronically stored information, "[t]he time for executing the warrant in Rule

13

41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Fed. R. Crim. P. 41(e)(2)(B). As the advisory committee noted in 2009, Rule 41's treatment of electronically stored information "acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Fed. R. Crim. P. 41 advisory committee's note on the 2009 amendments. Because factors such as encryption, complexity, and the work load of computer forensic labs may result in delays in completing the second step in this process, no presumptive time limit is found in the rule for when the review of a medium or copying of its data must be complete. *Id.*; *see also United States v. Beckman*, 786 F.3d 672, 680 n.6 (8th Cir. 2015).

If a violation of Rule 41 occurs, "the Court may exclude the evidence described in the search warrant only if the defendant is prejudiced or if reckless disregard of proper procedure is evidence." *Beckmann*, 786 F.3d at 680. In evaluating prejudice to the defendant, the Eighth Circuit has held that if the search would have occurred had Rule 41 been strictly adhered to, there is no prejudice to the defendant. *United States v. Turner*, 781 F.3d 374, 387 (8th Cir. 2015) (quoting *United States v. Hyten*, 5 F.3d 1154, 1157 (8th Cir. 1993)). And a finding of reckless disregard of proper procedure must be based on some suggestion of bad faith. *See id.* (citing *United States v. Berry*, 113 F.3d 121, 123 (8th Cir. 1997) (analyzing the "reckless disregard" issue as akin to "bad faith")).

In their dispute concerning the application of Rule 41, the parties disagree about when the search warrant was "executed." Mr. Garmon asserts that the execution of the warrant did not take place until CEAU lab unlocked the phone and made a copy of its contents on August 19, 2016. The government says that the warrant was executed when Agent Walden took custody of the phone and submitted it for on-site copying by the CART team on April 18, 2016. Neither party cites any case law applying the meaning of the phrase "seizure or on-site copying of the media or information" in Rule 41(e)(2)(B) in support of its position. The Court's initial

review, based on the plain language of the Rule and the 2009 committee note, supports the government's position that it followed the two-step process contemplated by the Rule, and that it completed the first step within the required 14-day window. But even if Mr. Garmon could establish that a violation of Rule 41's 14-day deadline occurred, the Court concludes that suppression is not required because Mr. Garmon can neither show reckless disregard for the Rule's requirements nor prejudice from the government's actions.

First, there is no suggestion of bad faith in the record. Mr. Garmon correctly points to evidence that at the time he sent the phone to Quantico for processing, Agent Walden knew his investigation of bank robberies in Minneapolis would not rate particularly high on the CEAU lab's list of priorities, which includes terrorism investigations. [Hr'g Tr. at 26.] However, knowledge of a possible or even probable delay does not rise to the level of bad faith or an intentional disregard of procedure. Agent Walden clearly believed that he had complied with the Rule. Not only did he testify to that effect, but he signed the return as executed on April 18, 2016.

The Eighth Circuit has recently affirmed a district court's denial of a suppression motion where the defendant argued "that the officers . . . exhibited a reckless disregard for proper procedure in light of the length of the delays, the government's failure to seek additional time from the court either before or after issuance of the warrant, and the deputy's testimony that the[] searches [at issue] are rarely completed prior to the prescribed deadline." *Beckmann*, 786 F.3d 680-81. "While best practice would have been for [the agent] to file a motion seeking additional time to execute the warrant, [her] failure to do so here does not warrant suppression." *Id.* at 681. Mr. Garmon points to no evidence from which it would be appropriate for the Court to conclude that the government engaged in reckless disregard of proper procedure.

The record also does not support any finding of prejudice to Mr. Garmon as a result of delay in actually searching the phone. The government correctly points out that probable cause for the search of the phone did not in any way dissipate during

15

the several month delay and the evidence to be seized did not become stale or deteriorate.[5] [Gov't's Resp. at 10 (quoting *Beckmann*, 786 F.3d at 681).]

### III. Cell Tower Data Search Warrant And Court Order

Mr. Garmon's motion concerning cell-tower data depends entirely upon the argument that the search warrant and court order authorizing the seizure of such evidence was based upon improperly obtained evidence from the traffic stop. Because the Court has concluded that the stop was supported by reasonable suspicion, suppression of this evidence is not required.

### IV. Recommendation

Based on the foregoing, the Court makes the following recommendations.

1. Mr. Garmon's Motion to Suppress Evidence Obtained as a Result of Search and Seizure **[ECF No. 22]** should be **DENIED**.

2. Mr. Garmon's Amended Motion for Suppression of Evidence Obtained Pursuant to the Execution of Search Warrants Related to Defendant's Cellular Telephone **[ECF No. 32]** should be **DENIED**.

Date: April 9, 2018                             *s/ Katherine Menendez*
                                                Katherine Menendez
                                                United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

---

[5] Mr. Garmon raises no argument in response to the government's assertion that he cannot show prejudice.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.