# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

           Plaintiff,

v.

Terrence Christian Garmon,

           Defendant.

File No. 17-cr-11 (SRN/KMM)

**ORDER ADOPTING REPORT
AND RECOMMENDATION**

---

Andrew S. Dunne, Benjamin Bejar, Thomas Calhoun-Lopez, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Patrick L. Cotter, Sieben & Cotter, PLLC, 105 Hardman Court, Suite 110, South St. Paul, MN 55075, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court on the Report and Recommendation ("R&R") of Magistrate Judge Katherine Menendez dated April 9, 2018 [Doc. No. 51]. In the R&R, Magistrate Judge Menendez recommends that (1) Defendant Terrence Garmon's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress the Traffic Stop Evidence") [Doc. No. 22] be denied and that (2) his Amended Motion for Suppression of Evidence Obtained Pursuant to the Execution of Search Warrants [Doc. No. 32] be denied. Garmon objected only to the R&R's findings and conclusions regarding his Motion to Suppress the Traffic Stop Evidence. (*See* Def.'s Obj. [Doc. No. 52].) The Government filed a response in opposition. (Gov't's Opp'n [Doc. No. 54].) For the reasons set forth below, and based on a full, *de novo* review of the relevant files and

records, including the transcript of the suppression hearing, this Court overrules Garmon's Objection and adopts the R&R in its entirety.

## I.     BACKGROUND

On January 18, 2017, Garmon was charged by indictment with five counts of bank robbery in violation of 18 U.S.C. § 2113(a). (Indictment, Counts 1–5 [Doc. No. 1].) On December 20, 2017 and January 11, 2018, he filed the underlying motions to suppress, and Magistrate Judge Menendez held a hearing on the motions on January 18, 2018. (*See* Min. Entry for Jan. 18, 2018 Proceedings [Doc. No. 38]; Mot. Hr'g Tr. ("Tr.") [Doc. No. 41].) At the hearing, the Government called three witnesses—FBI Agent David Walden ("Agent Walden"), (Tr. at 10), St. Paul Police Officer Chris Hanson ("Officer Hanson"), (*id.* at 36), and St. Paul Police Officer Michael Matsen ("Officer Matsen"), (*id.* at 81). Below, the Court recites the relevant factual background based on the testimony of these law enforcement officers, and then briefly describes the magistrate judge's findings of fact and conclusions of law.

### A.  Factual Background

During the first few months of 2016, several bank robberies occurred throughout the Twin Cities. (Walden Test., Tr. at 33.) These bank robberies exhibited the same "modus operandi and physical characteristics." (*Id.* at 10.) As a "bank robbery coordinator" for the FBI, Agent Walden became involved in the investigation of the robberies. (*Id.*) In this kind of investigation, Agent Walden works closely with local law enforcement, sharing intelligence information about the crime. (*Id.* at 11.)

Pursuant to that information sharing, Agent Walden worked to produce a "bulletin," referred to as the "Metro Regional Information Center Information Alert" ("MRIC Alert" or "Alert"), that contained information about the robberies and was distributed to local law enforcement throughout the metro area. (*Id.* at 11–12, 30.)  This MRIC Alert, issued on April 6, 2016, (*id.* at 30), contained a description and picture of the vehicle used in the robberies as well as numerous surveillance photos of the suspect "as he was entering, participating in, or leaving the bank robberies," (*id.* at 12). The vehicle identified in the Alert was a 1995 or 1996 Lincoln Town Car that was "possibly ivory metallic" in color. (*Id.* at 14.) The information contained in the Alert about the suspect was that he was a black male, possibly Somali, between 24 to 32 years old, approximately six feet tall, and with a thin build of approximately 140 pounds. (*Id.* at 34.) According to Agent Walden, although the information contained in MRIC Alerts is "not all encompassing," the Alerts contain "a sufficient amount of information that [he] feel[s] officers on the street can utilize to assist in the investigation or the capture or identity of the subject." (*Id.* at 12.) The MRIC Alerts are generally sent out by e-mail to "certain points of contact[] within each department" who then widely distribute them to patrol officers, (*id.* at 35), including during the morning "roll call[s]," (Hanson Test., Tr. at 38; Matsen Test., Tr. at 82).

On April 7, 2016, Officer Hanson and his partner Officer Matsen were made aware of the MRIC Alert during their morning roll call. (Hanson Test., Tr. at 38.) Officer Hanson testified that he "looked at" the Alert during this time, (*id.*), and Officer Matsen testified that he "looked at it several times" and in fact "studied" it, (Matsen Test., Tr. at 82–83). In

addition to it being printed out, the Alert was e-mailed to the two officers. (Hanson Test., Tr. at 38–39; Matsen Test., Tr. at 82.)

After viewing the Alert, Officers Hanson and Matsen began patrolling. While on patrol, they observed a Lincoln that they believed "very similarly exact matched the description of the vehicle in th[e] bulletin." (Matsen Test., Tr. at 83; *see also* Hanson Test., Tr. at 39 ("[W]e saw a vehicle that we believe closely resembled the vehicle from the bulletin pass[] in front of us . . . .").) With Officer Hanson at the wheel, the patrol car changed course to try to get "closer to [the Lincoln] to get a better look." (Hanson Test., Tr. at 39.) After the Lincoln made a turn, the officers observed that it began to speed away "at a speed greater than the posted speed limit." (Hanson Test., Tr. at 40; *see also* Matsen Test., Tr. at 84.) Officer Matsen testified that at that point the officers decided to initiate a traffic stop based on: (1) their belief that the Lincoln matched the description of the vehicle in the Alert; (2) the Lincoln's "speeding behavior" and the officers' perception that it was attempting to evade them; and (3) the fact that this was all occurring in a residential area. (Matsen Test., Tr. at 83.) Officer Matsen further testified that "[a]s [they] were approaching the vehicle to stop it, it abruptly pulled over to the side of the road and stopped." (*Id.* at 85.) At that point, the officers pulled up behind the vehicle and activated their lights. (*Id.* at 85–86.)

The officers approached the Lincoln and noticed four occupants. (*Id.* at 87.) Garmon was seated in the passenger's seat. (*Id.*) The officers ran a check on Garmon's identification, and their check alerted them that Garmon had an outstanding misdemeanor warrant out of Hennepin County. (*Id.* at 87–88.) The officers understood that it was within their discretion

whether to arrest Garmon for this warrant, and they ultimately decided to arrest him because they believed that he resembled the bank robbery suspect depicted in the MRIC Alert and because they believed that the Lincoln also matched the vehicle involved in the bank robberies. (*Id.* at 90–91.) The officers frisked Garmon and recovered a black Nokia cell phone that was later searched pursuant to a search warrant. (*Id.* at 96.)

Officer Matsen also retrieved items from the Lincoln. Before arresting Garmon, Officer Matsen had observed a black backpack at Garmon's feet in the front seat floorboard of the Lincoln. (*Id.* at 92–93.) After arresting him, Officer Matsen asked Garmon if the backpack was his and Garmon replied that it was not. (*Id.*) Officer Matsen nevertheless believed that the backpack belonged to Garmon because of where it had been positioned, so he retrieved it from the Lincoln and searched it. (*Id.* at 93.) Officer Matsen also retrieved from the Lincoln a black coat that "matched" the one worn by the bank robbery suspect shown in the MRIC Alert. (*Id.*) Eventually, after attempting to contact the FBI and taking pictures of the vehicle, Officers Hanson and Matsen took Garmon to the Ramsey County Law Enforcement Center. (Hanson Test., Tr. at 52.)

### B. Procedural Posture

After the hearing before the magistrate judge, the parties filed their briefs. (*See* Def.'s Mem. [Doc. No. 43]; Gov't's Resp. [Doc. No. 46]; Def.'s Reply [Doc. No. 49]; Gov't's Supp. Resp. [Doc. No. 50].) Garmon sought suppression of the evidence obtained from the Lincoln, arguing that Officers Hanson and Matsen made the traffic stop without probable cause or reasonable suspicion. (Def.'s Mem. at 8–16.) He also sought suppression of evidence obtained from the backpack, arguing that its search was not conducted pursuant to

a valid search incident to arrest. (*Id.* at 16–18.)  Garmon also argued that the search warrant for his cell phone had expired before it was executed, requiring suppression of the evidence obtained from the phone. (*Id.* at 18–20.) Finally, Garmon argued that the search warrant and court order authorizing disclosure of the cell tower data from the cell phone were "tainted" with unlawfully seized evidence, requiring suppression. (*Id.* at 20–22.)

On April 9, 2018, Magistrate Judge Menendez issued an R&R recommending denial of Garmon's two Motions. The magistrate judge first found that the officers' stop of the Lincoln was lawful because the officers had reasonable suspicion "that the Lincoln was involved in bank robberies." (R&R at 5–6.) Applying the appropriate "totality of the circumstances" test and relying on *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011), the magistrate judge found that the officers had properly relied on the MRIC Alert that they "had received that very morning," which contained "specific information tying the vehicle and possibly its occupants to a string of bank robberies." (R&R at 6–7.) Moreover, the magistrate judge held, "[i]n addition to the similarities between the stopped car and the car depicted in the MRIC Alert, the officers' suspicions were strengthened by the possibly evasive driving conduct they observed when they spotted the vehicle." (*Id.* at 7.) In short, the magistrate judge concluded that "[u]nder the totality of the circumstances, including the perceived evasive conduct and the similarity of the Lincoln to the vehicle in the MRIC Alert, it was reasonable for the officers to conclude that further investigation was warranted." (*Id.* at 8.)

With regard to the search of the backpack, the magistrate judge found that because Garmon had denied ownership of the backpack when Officer Matsen asked if it belonged to

him, Garmon had "forfeited his Fourth Amendment guarantee of privacy" and thus the search of the backpack did not implicate his constitutional rights. (*Id.* at 11–12 (quoting *United States v. Sanders*, 130 F.3d 1316, 1318 (8th Cir. 1997)).) With respect to the cell phone search warrant, the magistrate judge concluded that even if Garmon could establish that the Government violated Federal Rule of Criminal Procedure 41, "suppression is not required because Mr. Garmon can neither show reckless disregard for the Rule's requirements nor prejudice from the government's actions." (*Id.* at 15.) Finally, the magistrate judge concluded that because Garmon's arguments regarding suppression of the cell tower data were premised on his contention that the traffic stop was unlawful, no suppression was warranted since the stop had in fact been lawful. (*Id.* at 16.)

Garmon filed a timely Objection to the R&R. (*See* Def.'s Obj.) He only objects to the portion of the R&R concerning the legality of the traffic stop. (*Id.*) In essence, Garmon argues that the MRIC Alert, neither alone nor in combination with the officers' perception that the Lincoln was being evasive, provided the officers with reasonable suspicion to make the stop. (Def.'s Obj. 2–8.) The Government filed a response urging this Court to overrule Garmon's Objection and adopt the R&R in its entirety. (*See* Gov't's Opp'n.)

## II.    DISCUSSION

The district court must undertake an independent, *de novo* review of those portions of the R&R to which a party objects and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. LR 72.2(b)(3)..

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012) (alterations in original) (quoting *Wren v. United States*, 517 U.S. 806, 809–10 (1996)). "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). And important here,

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.

*Hensley*, 469 U.S. at 232 (internal citations omitted). However, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id.* This Court "consider[s] the totality of the circumstances in analyzing whether reasonable suspicion exists." *United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004).

Applying those principles here, this Court fully agrees with the magistrate judge that Officers Hanson and Matsen had reasonable suspicion to stop the Lincoln. Under the totality of the circumstances test this Court must apply, the officers' reliance on the MRIC Alert, combined with their observations about the Lincoln's response to their presence, surely "provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)). First, as correctly found by the magistrate judge, evidence in the record shows that when they encountered the Lincoln, the officers immediately "believe[d] [that it] closely resembled the vehicle from the bulletin" that they had received, both at the "roll call" and on their e-mail, and had studied that morning. (*See, e.g.*, Hanson Test., Tr. at 39.) This Alert contained a picture of the vehicle, as well as of the suspected bank robber, and had been generated through an investigation as described by Agent Walden. (Walden Test., Tr. at 12–14.)

Next, given their suspicion that the Lincoln was the one involved in the robberies, the officers acted "to get closer to it to get a better look," at which point they observed "that the vehicle was traveling at a speed greater than the posted speed limit," and that "the vehicle [wa]s maybe trying to elude or . . . get away from [them] for whatever reason." (Hanson Test., Tr. at 39–40.) Another factor that the officers considered before making the stop was location—the area where they encountered the Lincoln is residential, heightening the officers' concern as to why the vehicle may be speeding or otherwise acting evasively. (Matsen Test., Tr. at 83–84.) All of these factors, taken together, may reasonably lead an

experienced officer to conduct an investigatory stop. *See Collins*, 883 F.3d at 1032 (noting that "[f]actors that may reasonably lead an experienced officer to investigate include . . . location of the suspect parties, and the parties' behavior when they become aware of the officer's presence" (quoting *United States v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016))). In view of all of these circumstances, this Court, like the magistrate judge, concludes that Officers Hanson and Matsen had, at a minimum, a reasonable suspicion that the Lincoln, and potentially its occupants, could be involved in the bank robberies, warranting further investigation. The investigatory stop was thus lawful.

Garmon raises several arguments for why neither the MRIC Alert nor the Lincoln's evasiveness, standing alone or in combination, provided the officers with reasonable suspicion to justify the stop. With respect to the MRIC Alert, Garmon argues that the officers could not properly rely on the Alert because "[n]either of them pulled up the Alert to compare the Lincoln or confirm their suspicions until after the traffic stop was initiated," and that in any event, the MRIC Alert did not contain enough information, such as the license plate number, to provide the officers "with the requisite suspicion to support a *Terry* stop." (Def.'s Obj. at 4.) As explained above, this Court disagrees. First, whether the officers pulled up the Alert to compare the Lincoln immediately before the stop is immaterial. The record clearly shows that the Officers had viewed the Alert that very morning—which contained sufficiently, albeit not perfectly, detailed information—and had in fact "studied" it, allowing them to rely on the Alert to conduct an investigatory stop after they observed a car with similar characteristics as the one portrayed in the Alert. *See Farnell*, 701 F.3d at 262 (holding that officer had reasonable suspicion to stop the

10

defendant's van where officer was "aware of" a bulletin that included pictures of the suspect's van). This Court is not aware of any Eighth Circuit precedent, and Garmon does not cite any, requiring that officers affirmatively "double check" their suspicions against a bulletin that they are already familiar with before they may conduct an investigatory stop.

Garmon's argument that the Alert did not contain sufficient information is similarly unavailing. He highlights *United States v. Smith*, where the Eighth Circuit held that officers had reasonable suspicion to stop a vehicle based on a "wanted," or bulletin, that included the wanted vehicle's license plate number and a general description of the suspect. 648 F.3d at 656. Although it is true that the "wanted" in *Smith* contained a license plate number, nothing in that case indicates that a license plate number must invariably be included in an alert or bulletin before officers can justifiably rely on such an alert. In fact, the Eighth Circuit has found that officers had reasonable suspicion in cases where the bulletin or alert at issue contained a level of specificity similar to that contained in the Alert in this case. For example, in *United States v. Farnell*, the Eighth Circuit found that the officer had reasonable suspicion to pull over a white van because, *inter alia*, "[the officer] was aware of the . . . bulletins—which included multiple photos of a white van with a single door on the driver's side—and the April 29 dispatch, which described the bank robbery suspect's vehicle as a white van." 701 F.3d at 262.[1] Garmon further argues that "[a]llowing a stop based upon the information provided in th[e] MRIC Alert would allow law enforcement to stop any late

---

[1] Although the dispatch at issue in *Farnell*, but not the bulletin, listed the van's license plate number, the van that the officer pulled over in fact had a different license plate number. 701 F.3d at 262. If anything, this fact further confirms that officers need not have a license plate number "match" before they are legally justified in making an investigatory stop based on a bulletin or alert.

model Lincoln Town Center that is either tan or possibly ivory metallic within the entire Twin Cities metro area . . . ." (Def.'s Obj. at 5.)  In *Farnell*, however, the Eighth Circuit foreclosed that line of reasoning. *See id.* (rejecting defendant's argument that the officer's stated basis for traffic stop "was so lacking in actual detail that . . . almost any vehicle could be stopped under the guise of investigation").

This Court is similarly unpersuaded by Garmon's arguments (1) that the officers' observations of the Lincoln's driving behavior could not reasonably lead them to believe that the Lincoln exhibited evasive behavior, and (2) that "the officers' subjective perceptions of the Lincoln's driving conduct does not contribute to a reasonable suspicion supporting a *Terry* stop." (Def.'s Obj. 6.) Garmon lists all of the observations made by the officers that collectively led them to believe that the Lincoln was driving evasively, and which the magistrate judge concluded had cumulatively strengthened the officers' suspicions, and challenges them one by one. (*See id.* at 5–8.) At the outset, the Court declines to analyze whether each of the officers' observations, viewed in isolation, could reasonably support their belief that the Lincoln was driving evasively. *See Quinn*, 812 F.3d at 698 ("The totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002))). Viewing the evidence cumulatively, this Court agrees with the magistrate judge that the officers reasonably believed the Lincoln was acting evasively. It is well established that courts "allow 'officers to draw on their own experience and specialized training to make inferences from and deductions about the *cumulative information* available to them that might well elude an untrained person.'" *Collins*, 883 F.3d at 1032 (emphasis added) (quoting *United*

*States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015)). Finally, as correctly found by the magistrate judge, while evasive driving conduct may not necessarily be sufficient to constitute reasonable suspicion, such conduct may *contribute* to such suspicion when considered in the totality of the circumstances. *See United States v. Stachohwiak*, 521 F.3d 852, 856 (8th Cir. 2008).

In sum, based on a *de novo* review of the record and the parties' arguments, this Court fully agrees with the magistrate judge's findings of fact, reasoning, and ultimate conclusion that the information available to the officers, viewed collectively, provided "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the investigatory stop. *Winters*, 491 F.3d at 921 (quoting *United States v. Robinson*, 119 F.3d 663, 666–67 (8th Cir. 1997)). Accordingly, this Court overrules Garmon's Objection and adopts the magistrate judge's R&R in its entirety.

## III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Objection [Doc. No. 52] is **OVERRULED**;

2. Magistrate Judge Menendez's R&R of April 9, 2018 [Doc. No. 51] is **ADOPTED** in its entirety; and

3. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 22] and Amended Motion to Suppress Evidence Obtained Pursuant to the Execution of Search Warrants Related to Defendant's Cellular Telephone [Doc. No. 32] are **DENIED**.

Dated: May 25, 2018                     s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge