1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                      )
      UNITED STATES OF AMERICA,       )   File No. 17-cr-11
4                                     )            (SRN/KMM)
             Plaintiff,               )
5                                     )
      vs.                             )   Saint Paul, Minnesota
6                                     )   November 9, 2018
      TERRENCE CHRISTIAN GARMON,      )   9:43 a.m.
7                                     )
             Defendant.               )
8     ------------------------------------------------------------

9
              BEFORE THE HONORABLE SUSAN RICHARD NELSON
10               UNITED STATES DISTRICT COURT JUDGE
                         **(SENTENCING HEARING)**
11
      APPEARANCES
12     For the Plaintiff:        UNITED STATES ATTORNEY
                                 THOMAS CALHOUN-LOPEZ, AUSA
13                               BENJAMIN BEHAR, AUSA
                                 300 South Fourth Street
14                               Suite 600
                                 Minneapolis, Minnesota 55415
15
       For the Defendant:        SIEBEN & COTTER
16                               PATRICK L. COTTER, ESQ.
                                 105 Hardman Court
17                               Suite 110
                                 South St. Paul, Minnesota 55075
18
       Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
19                               Suite 146 U.S. Courthouse
                                 316 North Robert Street
20                               Saint Paul, Minnesota 55101

21

22

23

24        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4          THE COURT:  We are here this morning in the matter

5     of the United States of America versus Terrence Christian

6     Garmon.  This is criminal file 17-11.  I would invite

7     counsel and Mr. Garmon up to the lectern and I would ask

8     counsel to note your appearances, if you would.

9          MR. CALHOUN-LOPEZ:  Good morning, Your Honor.

10     Thomas Calhoun-Lopez and Benjamin Bejar for the United

11     States.

12          MR. BEJAR:  Good morning.

13          THE COURT:  Good morning.

14          MR. COTTER:  Good morning.  Patrick Cotter on

15     behalf of Mr. Garmon who is personally present.

16          THE COURT:  Good morning to you, Mr. Garmon.

17          THE DEFENDANT:  Good morning, Your Honor.

18          THE COURT:  Now, we are here today for your

19     sentencing, and I want you to know in preparation for your

20     sentencing I've gone back and reviewed your Presentence

21     Investigation Report.  I've gone back and looked at the

22     guidelines.  Each of the lawyers submitted position papers

23     and I've taken a look at those.  I've consulted with

24     probation.  I've gone back and looked at the Plea Agreement

25     and the Indictment, and I have read all the very supportive

1    letters that you have received from your aunts and your

2    cousins and your sister.

3              Mr. Calhoun-Lopez, has the Government received a

4    copy of the PSR and the addendum?

5              MR. CALHOUN-LOPEZ:  Yes, Your Honor.

6              THE COURT:  Mr. Cotter, have you as well?

7              MR. COTTER:  Yes, Your Honor, I have provided one

8    to my client.

9              THE COURT:  Have you had a fair opportunity to

10   review them with your client?

11             MR. COTTER:  Yes.

12             THE COURT:  Now, I know there were initially

13   objections posed to the PSR but, Mr. Cotter, my

14   understanding is that you have withdrawn those objections;

15   is that right?

16             MR. COTTER:  That, and for the record, I would

17   note that we're withdrawing those objections at this time.

18             THE COURT:  Okay.  Very good.  And so as I

19   understand it, there are no remaining objections to the PSR.

20   Is that correct?

21             MR. CALHOUN-LOPEZ:  It is for the Government, Your

22   Honor.

23             MR. COTTER:  Yes, Your Honor.

24             THE COURT:  All right.  The Court will grant a

25   2-level downward adjustment in the offense level.  At this

1    time, Mr. Calhoun-Lopez, does the Government move for an

2    additional level?

3                    MR. CALHOUN-LOPEZ:  We do, Your Honor.

4                    THE COURT:  Very good.  That motion is granted.

5    The Court determines that the guidelines apply as follows:

6                    Total offense level of 22, criminal history

7    category II, an advisory imprisonment range of 46 to 57

8    months, a supervised release range of 1 to 3 years, a fine

9    range of $15,000 to $150,000; and in this case a special

10   assessment of $300, which would be $100 per count.

11                   Does the Government have any corrections or

12   objections to that guideline range?

13                   MR. CALHOUN-LOPEZ:  No, Your Honor.

14                   THE COURT:  Does the defense?

15                   MR. COTTER:  No, Your Honor.

16                   THE COURT:  Very good.

17                   I understand, Mr. Cotter, that you wish to make

18   motions both for downward departures and variances, and you

19   may be heard on anything else you would like to say on

20   behalf of Mr. Garmon at this time.

21                   MR. COTTER:  Thank you.  Your Honor, again, I

22   would incorporate my previous arguments that I have written

23   by reference and I would just like to highlight some aspects

24   of those.

25                   First, I briefly note that we did address the

1    criminal history score and the increase from what we

2    believed it would be at the time of the Plea Agreement,

3    which again doesn't impact whether or not we move forward

4    today -- my client's well aware of that -- but the basis for

5    those were two petty misdemeanor marijuana citations or

6    payable fines.  Certainly they are countable, but when you

7    think of them in relation to a felony point from a previous

8    offense, we'd note that we believe, and that's what we

9    contemplated when we addressed the Plea Agreement, that

10   Criminal History Category I is more appropriate in the sense

11   of how it should be treated by the Court.  I'll just leave

12   that as is.

13          Moving on to our motion for a downward variance, I

14   asked for a variance downward.  My client has asked me to

15   ask for an even bigger variance based upon his conduct over

16   the last two and a half years since these offenses occurred.

17   He's asking the Court to continue him on a probationary

18   sentence with home confinement and all other terms that he's

19   been under.  So that's the substantial variance that I'm

20   moving the Court for this morning on his behalf.

21          When looking at -- these are serious offenses and

22   the starting point, and I think one of the main aspects of

23   the guidelines, is addressing both punishment and deterrence

24   that gets taken into account for bank robbery type of

25   offenses, in addition to the importance to let others in the

1    community know that there will be a punishment if these

2    offenses occur.

3             Countervailing that is the -- I'm going to combine

4    what's stated in many sentences in the 3553(a) factors into

5    rehabilitation and the need for confinement to correct the

6    particular individual that's being sentenced.

7             And so you look at the nature and characteristics

8    of Mr. Garmon, you look at the need to protect the public

9    from future crimes by Mr. Garmon, you look at the need for

10   additional correctional, vocational training and all of

11   those types of things that often times people being

12   sentenced before Your Honor need in order to be successful

13   in the community, and they have not been able to accomplish

14   that without the need for confinement.

15            In this particular instance, I think the most

16   driving factor, whether that's due to how long it took or

17   not, when you look at the particular individual, these

18   offenses ended in April of 2016.  They expand over a few

19   months, and it was at a time that Mr. Garmon -- and this

20   isn't uncommon -- was driven entirely by severe addiction.

21   Not just to marijuana, but when he got into the crack

22   cocaine, that is what led him to a very severe and quick

23   downward spiral.

24            However, in the two and a half years -- and here's

25   the thing that I think is different -- between April of 2016

1    and November of 2016 and then onward, he actually removed

2    himself before there was ever any criminal -- now there may

3    have been some investigations ongoing -- and not may have,

4    there were -- investigations ongoing and eventually they

5    were trying to find him after he was indicted nearly a year

6    later.  But for purposes of what he was doing with his life

7    and what he knew, he removed himself from that scenario

8    before the system, before law enforcement, before probation,

9    before a court needed to do that.

10          And what does that mean?  That means that he was

11   not someone that was just doing it for the sole purpose of

12   trying to appease a court.  He was doing it authentically

13   because he knew that he needed to go back to where his

14   support was, to get away from the negative influences and to

15   get his life back on track, and that happened in November of

16   2016.

17          He wasn't arrested on an Indictment, through no

18   fault of his own, until a year later.  And actually it was I

19   believe October, and then by the time he was brought up here

20   to Minnesota it was almost exactly a year ago.  November

21   15th of 2017 was his initial appearance.

22          During that time he had gotten himself a job,

23   removed himself from all type of criminal activity.  He

24   hadn't completely cleaned up because he had a dirty UA for

25   marijuana when he was arrested, and he's had nothing since.

1    But he got himself away from the very hard street drugs that

2    led him to the offenses that he committed without any

3    intervention or without someone saying you need to do this

4    in order to not be in jail.  This was something he did on

5    his own; and he got employed and all of those things.

6        So then over the course of the next year, they

7    took a big chance on him by releasing him, you know, across

8    the country to go back to North Carolina on pretrial

9    release, and he has met every parameter for treatment and

10   aftercare and being employed and maintaining contact and

11   having zero violations of any kind during that.

12       So now we're at two and a half years later with

13   someone who had removed themselves before the system was

14   involved.  To me, and I hope to you, that shows when we're

15   looking at the need for rehabilitation, the need for

16   deterrence, the concern for potential recidivism by this

17   particular defendant, and the likelihood that he's going to

18   require significant training and correction during a prison

19   term, in fact he has shown this Court over two and a half

20   years that he is a productive, law abiding, sober, employed

21   member of the community, and a faith community with a family

22   that is surrounding him; and so now putting him in prison

23   really only sets him and all the people that he is a part

24   of, it sets them back, all so that we can punish.  Weighing

25   that, all so that we can punish for the crime he committed.

1            And being on probation where you have such

2     strict -- you're not just free to just live your life.

3     There still is a punishment, a deterrence that has been

4     going on and that would continue to go on if the Court

5     adopted the sentence that's being requested.

6            So based on those mitigating factors that are

7     unique to this particular defendant and all of the factors,

8     ultimately punishment versus rehabilitation, I believe that

9     this request is supported by an overweighing of that

10    rehabilitation piece that's occurred versus the need to

11    punish with a substantial prison term.

12           So I'm asking the Court to adopt that with

13    specifics.  If the Court were to impose a prison term, I'd

14    ask the Court to consider the following:

15           One, I'd ask the Court to consider a BOP

16    designation recommendation for North Carolina.

17           Two, I'd ask in the event that the term imposed

18    and all other requirements are met, that he be considered

19    for RDAP so that he can continue the sobriety that he's

20    already gained, and continue to learn even more skills to

21    maintain that.

22           I'd ask the Court to also, and we can address this

23    further after the Government speaks, consider a voluntary

24    surrender.  The exceptional circumstances would be

25    essentially everything that I have just argued to the Court,

1    so I don't think I should restate it to you.

2           And last, but not least, there wasn't a motion

3    filed, but in speaking to my client's mother, Armagene Smith

4    yesterday, she asked if she could address the Court prior to

5    sentencing.  So I didn't file a motion.  I wasn't aware that

6    that would be a request.  But if the Court would entertain

7    that, she's present and would like to be able to address the

8    Court at the appropriate time.

9           THE COURT:  Thank you, Mr. Cotter.

10          Well, I think we'll hear from Mr. Garmon and then

11   we'll hear from his mother and then we'll hear from the

12   Government.

13          Mr. Garmon, this is your chance to speak to me on

14   your own behalf if you wish to do so.

15          THE DEFENDANT:  Thank you, Your Honor.  I would

16   just like to say that I know what I did was wrong and I

17   understand that I need to be held accountable for what I

18   did.  What I would just like to say is that I feel like I

19   have shown, even as Mr. Cotter said, prior to being

20   essentially forced to get on the straight and narrow, I had

21   already made choices and decisions and I had already made

22   determinations in my mind to do so and I showed that in my

23   actions.

24          I do understand that we're not here about my

25   present but we're here about what I did in the past, so I

1   would just like to -- for you to keep in mind that, you

2   know, life, like everyone other's lives, is about full of

3   peaks and valleys; and when I was in a valley, I made the

4   wrong decisions and I understand that I need to be held

5   accountable for that, but I would just like you to keep in

6   mind what I have shown in its entirety essentially, Your

7   Honor.

8         And I thank the Court.  I would just like to say

9   that my mother didn't raise me for the penitentiary so for

10   having to have her go through this is very trying.  But,

11   again, I just want to be held accountable for what I have

12   done and I just want you to apply some grace wherever you

13   can based upon my actions.  That's all.

14         THE COURT:  Thank you, Mr. Garmon.

15         I will ask Ms. Garmon's mom to come up.  Let's

16   give her some space.  Good morning.

17         MS. ELLIS-SMITH:  Good morning, Your Honor.

18         I want to start by thanking the Court for

19   everything that you have done thus far.  I was here at the

20   change of plea hearing via phone and I heard Your Honor say

21   that she would have to find extraordinary circumstances in

22   order to send Terrence back to North Carolina subsequent to

23   his plea of guilty, so I thank the Court for that.  I also

24   thank the prosecutor for not opposing that decision, and

25   agree with Mr. Cotter that that would be the right thing to

1   do at that time.

2              As my son stated, just -- I never knew I would be

3   in this position.  No, I never raised him for the

4   penitentiary.  I remember in middle school he was being

5   bullied by some boys and he said, Mom, they said that I'm

6   too soft.  I'm not hard.  I said, Well, you tell them that

7   your mother said that you don't have to be where you're

8   going.  I'm raising you to go to university, not

9   penitentiary.  I said, They will have to be where they are

10  going.

11             And so with regard to just looking at the

12  perspective of 2016, it was so poignant in my mind, I was at

13  a Goddaughter's law school graduation.  I had travelled to

14  the State of Ohio to go to one of my Goddaughter's law

15  school graduations because I promised her, because at the

16  time Katie didn't know what she wanted to do with her life.

17             It's always been a desire of mine to go to law

18  school.  I haven't achieved that goal yet, but it's still a

19  desire of mine; and I said, Katie, you don't know what you

20  want to do with your life, I said, so why don't you dedicate

21  your life to helping others.  I said, Why don't you go to

22  law school.  And she said, Auntie, I don't know about that.

23  I said, I know you don't so that's why I'm telling you.  Go

24  to law school.  And I said, I promise you if you go, I'll be

25  there when you come across that stage.

1           And she went to law school.  She graduated.  I was

2    there.  She didn't even know I was coming.  I said, I

3    remember the promise I made to you four years earlier, I

4    said, so I'm here.

5           And that day was so poignant not just because of

6    her graduation but because my son called me.  It was May

7    2016.  He called me on my way to her gradation dinner and he

8    said, Mom, I need some money.  I'm hungry.  I said, You are?

9    He said, Yes.  I said, How much do you need?  And he said,

10   Just enough for groceries for the week.  I said, Okay.  The

11   only cash I had available was the hundred dollars I was

12   putting in Katie's card, I said, but I'll send you $50, I

13   said, and I'll explain it to her.

14          So I remember going to the dinner and I said,

15   Katie, I know law school graduation is a great big deal and

16   $50 seems very small.  I intended to put a hundred dollars

17   in here but your Godbrother -- we call him Christian -- I

18   nicknamed him "Buster" in my womb just because of his

19   interactions, he was always a very vibrant child -- I said,

20   Buster needed $50 for groceries.  And she said, Oh, Auntie,

21   I understand.

22          And it was subsequent to that time that I told

23   him, that was in May, I said, You're going to have to make

24   better decisions for your life.  I said, You will soon be 25

25   years old and I know you don't like asking me for money, I

1    said, but you have to make decisions for your life that's

2    going to better your life because you shouldn't have to ask

3    me for anything.  You should be fully prepared to meet the

4    world.

5              And what I told him was that in preparation for

6    preparing to be 25, that I was very proud of decisions that

7    he had made in his personal life in that he doesn't have any

8    children.  He hasn't made any mistakes with regard to

9    getting involved as far as marrying the wrong person or

10   people.  So I told him, I'm very proud.  And that's

11   something we always talked about when he was younger, about

12   making those right decisions that can impact the rest of

13   your life or all of your life.  He saw how my life went.

14   How I was impacted by divorces.  How I was impacted by being

15   a single parent at times.  So he was well versed with that

16   part of life and I think he embraced the knowing that he has

17   to make the right decisions for his life.

18             So that was in May.  In June 2016, I had to take a

19   flight up to Chicago.  My mother was diagnosed with

20   pancreatic cancer.  And while that was a very tremendous

21   situation, since we are a family of faith, nearly three

22   years later she's still here with us.  She has defied all

23   odds.  She's defied all medical reports.

24             In June we got that diagnosis.  Three weeks later

25   I received word that my nephew, who was like a son to me,

1    who at times had been raised in the same home as Christian,

2    was killed in a motorbike accident out of country.  And the

3    thing that we said, because we were so upset because he was

4    so far away, because of everything that we had to go through

5    with the State Department, we couldn't bring his body home

6    so we had a memorial service on July 23rd, 2016.

7           Christian came down for the memorial service and I

8    talked to him that day.  I said, You see, your cousin, who's

9    like a brother to you, was killed in Thailand.  I said, We

10   can't bring his body home because it was so many

11   complications with doing that.  I said, Now you have a

12   choice to make.  You can continue to be away from the family

13   that loves and supports you or you can come home, humble

14   yourself, so that you can make better choices for your life.

15   I said, His choices have ended because his life is over.

16   He's gone now.

17          So during his 25th birthday, we normally celebrate

18   Thanksgiving in Indiana, he said, Mom, I'm coming to

19   Thanksgiving and I'm going to come home and I'm going to

20   make my life better.  I'm going to do what you said.  I

21   said, Well, I'm so happy for that.

22          He came to North Carolina, began to work.  It was

23   not until I think March or April of 2017 we began to hear

24   some squirmishes [sic] about an outstanding warrant and that

25   there was an outstanding warrant for bank robbery.  I never

1    discussed it with my son.  I did call the person that

2    stopped by the house to make inquiries.  I did also have an

3    attorney that I know who works in the federal system to look

4    for the warrant because I -- what I did tell him was about

5    there was a warrant for your arrest; you're going to have to

6    face it.  You're going to have to present yourself to that

7    body.  But every word that we got back was no, there was no

8    warrant; and then we found out later it was because it was

9    under sealed Indictment.

10            So he had already relocated to North Carolina in

11   2016.  The Indictment came down in January 2017.  We found

12   out about it after he was arrested on his job on October the

13   23rd, 2017.

14            While my son was in custody, and the only reason

15   we knew something was off, was because he didn't come home.

16   We were in contact with each other daily.  And so my

17   daughter said, Mom, Buster didn't come home.  And I said,

18   Let's call around.  I called the federal courthouse there in

19   Raleigh and they said, Yes, he's been arrested.  He's been

20   arraigned and he's going to be facing charges in Minnesota.

21   I said, Okay.  Well, please stay in touch with us.

22            Three days later I got word -- my mother called

23   me.  My oldest brother had died on October the 26th, 2017.

24   I had to plan that service.  I had to travel to Indiana for

25   that funeral.  I did not have the opportunity to tell my son

1    that his uncle had died.

2           When he came and he finally did make it to

3    Minnesota where he was arraigned, I did make the request

4    that he be allowed to travel back to North Carolina while

5    this process was taking place.  I was advised that it would

6    not be likely.  I said, I understand.  I said, I'm not

7    there -- if I was there, I would ask.

8           I said, So since I'm not there, if you would ask

9    on my behalf that he be permitted, I said, I give you my

10   word he will be at every court proceeding, he will follow

11   every rule, every regulation.  Whatever is required, it will

12   be done.

13          I am -- and I haven't told him that I'm proud that

14   he has followed the pretrial release guidelines.  That he

15   has gone through the drug treatment program.  That he has

16   completed that.  He showed me his certificate that he

17   completed and that he does follow the rules for.  For

18   someone with his type of personality, because he's so active

19   and he used to stay gone all the time, so for someone to be

20   in the house except for the sole purpose of going to drug

21   counseling and/or working, this has been a very trying

22   experience for him.

23          As I explained to Mr. Cotter, the one thing I

24   wanted to make clear, only because I can, when he did return

25   home after being in custody for 30 days, there was a lot of

1    discombobulation as far as his mindset, his spirit, his

2    ability to focus, his ability to get things on track, and I

3    had to talk with him constantly.  And I said, We have to try

4    to regroup here.

5              And so I said that to say while I do understand

6    the need for punishment, punishment to one person is not

7    always punishment to another.  For people who prepare to go

8    to penitentiary, they accept that as just another phase of

9    their life.  But for a person who was always told that

10   you're going to university and not penitentiary, this is not

11   just another phase of life that we anticipated going

12   through.

13             So with that being stated, I implore the Court,

14   and I'm asking that whenever the sentence is given, imposed,

15   I am actually requesting that since he has begun the

16   rehabilitation process and paying his debt to society, that

17   he continue in that same vein as far as being on the ankle

18   monitoring, home confinement; as well as, as Mr. Cotter

19   stated, if prison is imposed, that he be allowed to be in a

20   place in North Carolina.

21             My husband does prison ministry.  We go to the

22   federal prison up there.  I haven't been recently.  My

23   husband has gone several times.  We had a young man, a

24   family from Chicago whose son was there, so my husband would

25   go and minister to him.  And as I told my son on this

1     morning, I can't imagine getting on a plane to come and

2     visit you in the penitentiary, so that's why that request

3     was being made.

4               And also the request that -- and I heard Your

5     Honor state it at the last change of plea hearing -- that at

6     this hearing we would discuss the possibility of surrender

7     if prison is implicated, that that would be one of the

8     things that would be under advisement as well.  So that's

9     the other thing, making my plea to this Court.

10              I do thank you for your time and I thank you again

11    for what you've already done.  I appreciate it.  And again,

12    I thank this prosecution also for what you have already

13    done.  Thank you.

14              THE COURT:  Thank you.

15              Mr. Calhoun-Lopez.

16              MR. CALHOUN-LOPEZ:  Your Honor, we are persisting

17    in asking for a guideline sentence, the defense's and

18    Mr. Garmon's and the Defendant's mother's comments

19    notwithstanding.  The reason is we can't know where

20    Mr. Garmon would have ended up or what would have happened

21    if he hadn't been arrested on April 7th of 2016.

22              We do know that he had committed -- he was just

23    after his fifth bank robbery, and we know that they were

24    becoming more brazen as these robberies went on.  The time

25    between the robberies was getting shorter and he continued

1    doing it even after he was recognized by a teller and had to

2    abandon one of his robberies.  He was stopped on April 7

3    approximately one week after his fifth robbery, and he was

4    only stopped by a sharp-eyed police officer and a diligent

5    FBI agent.

6            I think one thing that is clear, Your Honor, is

7    that it was very fortunate that he was stopped when he was.

8    It was fortunate for everybody.  It was fortunate for the

9    banks, of course, but it was also fortunate for Mr. Garmon

10   because it put an end to his activities.  It kept him from

11   getting hurt and it kept him from hurting anybody else.

12           Now, there is no evidence, to be clear, of any

13   kind of violence on Mr. Garmon's part.  But the point of

14   that -- the fact of the matter is, and the reason why these

15   are such dangerous crimes, is that people do often get hurt

16   in bank robberies.  It is a, per se, dangerous activity,

17   even more so than a regular felony.  It puts everyone's

18   lives at risk.  It puts Mr. Garmon's life at risk.  It puts

19   security guards at risk; the tellers, and innocent

20   bystanders who are all too often hurt in either the robbery

21   itself or in the flight from apprehension.

22           Mr. Garmon is a young man.  He has time to get his

23   life back on track and I expect that he will do so.  But

24   before he does so, he must pay a penalty for what he has

25   done in this case.

1           Your Honor, it's very good to see Mr. Garmon's

2     support.  It's a very inspiring thing that's always very

3     good.  He is clearly an intelligent man, a resourceful man,

4     and he comes from a very good family.  His mother's comments

5     were very heartfelt and very gracious and very moving; but

6     that's a fact that cuts both ways, Your Honor, because to

7     whom much is given, much is expected.

8           This is not a defendant who had nothing and who

9     lived a life of desperation that caused him to do this sort

10    of thing.  He had a support network that he could have

11    relied upon and clearly should have relied upon.

12          Your Honor, it's not clear at this point that

13    Mr. Garmon understands yet the significance and the

14    seriousness of his conduct.  He is asking for an

15    extraordinarily high downward variance and he has not

16    pointed to any factors that would justify such an

17    extraordinary remedy from the Court.

18          When you look at the factors that show an

19    extraordinary potential for rehabilitation, it seems to me

20    that they include an early acceptance, if not an immediate

21    acceptance of responsibility, and a recognition of the harm

22    that he has caused and genuine contrition.

23          And it's not clear that Mr. Garmon has shown those

24    things at this point.  He has referred to these events as

25    being trying for himself, and I'm sure that they are, but

1    they've also been difficult for the witnesses and the

2    tellers who were frightened during these robberies, and he

3    has not at this point recognized that.  Your Honor, at

4    these -- and they can -- I mean, the tellers were not

5    traumatized in this case, but tellers certainly have been in

6    past bankruptcies and it can in fact change their lives at

7    some point.

8            And so, Your Honor, to provide just punishment, to

9    reflect the seriousness of this conduct, and to deter

10   Mr. Garmon and to impress upon him the extremely serious

11   nature of what he has done here, a lengthy sentence is

12   necessary; and we do submit that a guideline sentence is

13   sufficient and not greater than necessary to meet the

14   objectives of federal law.

15           THE COURT:  Thank you, Mr. Calhoun-Lopez.

16           All right.  Is there anybody else who wishes to be

17   heard today?

18           All right.  We will proceed with sentencing.

19           Mr. Garmon, you have been charged with and you

20   have pled guilty to three counts of bank robbery and it is

21   now time for your sentencing.

22           It is therefore adjudged that you will be

23   committed to the custody of the Bureau of Prisons for a

24   period of 40 months on each of Counts 1 through 3 to be

25   served concurrently at the same time, so the total will be

1    40 months.

2              I will recommend to the Bureau of Prisons that you

3    be designated to a facility in North Carolina.  My

4    understanding is that the Butner facility is close to your

5    family and I will specifically make that request.  All I can

6    do is make a recommendation.  The Bureau of Prisons has the

7    right to make its own decision, but I will certainly make

8    the recommendation.

9              THE DEFENDANT:  Thank you, Your Honor.

10             THE COURT:  I will also recommend that you be --

11   that the RDAP program be made available to you; and I would

12   encourage you, despite your success of the last few years, I

13   would encourage you to take advantage of it; and if you

14   successfully complete it, that could take some time off your

15   sentence as well.

16             THE DEFENDANT:  Thank you, Your Honor.

17             THE COURT:  No fine is ordered.  Mandatory

18   restitution in the amount of $3,552 is due to the victim

19   bank in this case.

20             Payments of not less than $50 a month are to be

21   paid over the period of your supervised release, which we'll

22   discuss in a moment, which will commence 30 days after your

23   release from prison.

24             You'll make those payments to the Clerk of the

25   United States District Court who, in turn, will disburse

1   them to the victim bank.

2           Over your period of incarceration, you will be

3   employed in prison and hopefully you will take advantage of

4   that opportunity to get some vocational training.  And

5   you'll also make payments of either quarterly installments

6   of a minimum of $25 if working non-UNICOR, or a minimum of

7   50 percent of your monthly earnings if you're working

8   UNICOR.

9           And it is recommended that you participate in the

10  inmate financial responsibility program while you're

11  incarcerated.

12          Now, your obligation to pay the full amount of

13  restitution continues even after the term of your supervised

14  release has ended until your full restitution payment is

15  made.

16          On release from imprisonment, you will be placed

17  on supervised release for a period of two years.  That term

18  consists of two years for each of Counts 1 through 3, again

19  to run concurrently.

20          While you're on supervised release, there are a

21  number of rules, conditions, and here they are:

22          You shall not commit any crimes, federal, state,

23  or local.

24          You shall not illegally possess a controlled

25  substance, and you shall refrain from any unlawful use of a

1   controlled substance; and you will be submitted to random

2   drug testing.

3            You must cooperate in the collection of DNA.

4            Within 72 hours after your release from

5   imprisonment, you must appear at the closest Probation and

6   Pretrial Services Office to the prison.  The prison will

7   tell you where that's located.  You have 72 hours in which

8   to appear.

9            You shall not own, possess, or have access to a

10  firearm, ammunition, destructive device, or any dangerous

11  weapon.

12           You must abstain from the use of alcohol and other

13  intoxicants, and not frequent establishments whose primary

14  business is the sale of alcohol.

15           As I said, you must submit to substance abuse

16  testing as approved and directed by your probation officer.

17           You shall provide the probation officer access to

18  any requested financial information, including credit

19  reports, credit card bills, bank statements, and telephone

20  bills; and you shall be prohibited from incurring new credit

21  charges or opening additional lines of credit without

22  approval of your probation officer.

23           What will actually happen with substance abuse is

24  you will -- the results of the discharge program from your

25  outpatient treatment that you have been through and RDAP, if

1    you go through that, will be provided to your probation

2    officer and there will be a judgment about whether future

3    substance abuse treatment at some sort of level, even if

4    it's NA, is advised; and then you will be obliged to

5    cooperate with that treatment protocol.

6            A $300 special assessment for the Crime Victims

7    Fund is required by statute to be paid immediately.

8            There is no question that the most difficult thing

9    I do as a federal judge is sentence people.  It's a

10   responsibility that weighs heavily on me all the time.  It's

11   not something I can leave at the office.  It's something

12   that I live with.  It's part of my responsibilities here,

13   but it is a very significant burden and responsibility.  So

14   it's important, I think, for you to understand what the law

15   requires of me and then to understand how I have applied

16   that in your situation.

17           The law tells me to start with the guideline range

18   in this case.  That has to be the starting point of my

19   analysis.  I don't have to assume that that range is

20   reasonable, but it must be where I start my analysis from.

21   And then I consider aggravating circumstances, which I'll

22   talk about in a minute, related to the offense or your

23   conduct; and I balance it against mitigating circumstances,

24   positive circumstances, because what the law wants me to do

25   is ensure that you're not in prison one day greater than

1    necessary to accomplish the goals of sentencing, and the

2    goals of sentencing focus primarily on the need to ensure

3    that you won't reoffend.

4         The goals of sentencing include the need for a

5    just or fair punishment in this case; to promote respect for

6    the law; to provide just punishment; to reflect the

7    seriousness of your offense; to deter you from committing

8    crimes in the future; importantly, to deter others from

9    committing crimes, specifically, bank robberies; to protect

10   the public; to give you the kind of needed care and

11   treatment and training you need to ensure that restitution

12   is paid to the victim of your offense.  And importantly, to

13   make sure that there isn't an unfair disparity between your

14   sentence and the sentence of others who are similarly

15   situated who have committed similar numbers of bank

16   robberies, for instance, because there needs to be a sense

17   in the community that there's uniformity about the

18   sentencing, that there's fairness of the sentencing.

19        So those are the -- that's what the law requires

20   of me and that's what I take so seriously when I try to

21   craft a fair sentence.

22        And so you can see that weighing and balancing

23   those factors, I have concluded that it is appropriate in

24   your case to go below the sentencing guideline range, to

25   vary downward from the lower end of that guideline range

1    because in my view, as I will talk about in a moment, the

2    mitigating circumstances here justify that over the

3    aggravating circumstances.

4            I don't believe that a downward departure for

5    criminal history score is warranted here because although I

6    agree that it's a factor that I've considered in my

7    variance, I don't believe that a Category II criminal

8    history score substantially overrepresents your criminal

9    history, which is what the law requires.

10           So if we turn for a moment to the aggravating

11   factors, they are serious.  In a three-month stretch of time

12   you became a serial bank robber.  I mean, it's almost hard

13   to imagine, robbing, it appears, five banks in the Metro

14   area.  And, as the Government correctly states, bank robbery

15   is an inherently dangerous felony for obvious reasons.  It

16   terrorizing tellers, it puts innocent people at risk.  It

17   puts you at risk.

18           Also, the other aggravating circumstance here is

19   it took you some time to take full responsibility for these

20   actions, and that's a concern when we think about whether

21   someone is really completely rehabilitating.

22           But there are very significant mitigating factors

23   to consider here as well.  It looks like, by all accounts,

24   these bank robberies were driven by an addiction to crack

25   cocaine and alcohol.  Since 2016 you have not committed any

1    criminal offenses.  Your entire criminal history before this

2    spree of bank robberies consisted of minor marijuana

3    possession charges.  You've never before been incarcerated

4    until this case.

5            Since the bank robberies, as you point out, even

6    before you were indicted, you made a conscious decision to

7    turn your life around and that's something I give great

8    credit to and you should take great credit for that.

9            You entered outpatient substance abuse treatment.

10   You returned to your incredibly supportive and loving family

11   and that environment.  You got away from the toxic

12   influences that are here for you in Minnesota.  You

13   maintained employment.  You even began college classes.

14           That is a post-offense rehabilitation story that's

15   rare and it gives me promise and hope that you won't

16   reoffend in the future.

17           You've remained compliant with the conditions of

18   your pretrial release.

19           And perhaps the most important factor to me in

20   determining whether you will reoffend, since I sit here day

21   after day and see offenders, is the presence of a strong,

22   supportive family.  That is -- that is the most important

23   factor in anybody's life, and I think that is what gives me

24   such confidence that you can go forward in a productive way.

25   You can give back to your community.

1          It was very moving for me to hear from your

2     mother.  She's a remarkable woman.  I probably don't need to

3     tell you that.

4          THE DEFENDANT:  Yes.

5          THE COURT:  I really think she probably should go

6     to law school.  That was one of the most persuasive set of

7     remarks I've ever heard.  I would disagree on one point.

8     She talked about raising you not to go, as she said, to the

9     penitentiary but to go to the university.  You're probably

10    not going to go to a penitentiary.  You're probably going to

11    go to a lesser secure prison; but setting that aside, you

12    can do both with your life.  You can finish this prison term

13    and you can live up to the expectations she has for you and

14    you have for yourself, and I know you will do that.

15          I know when you get out of prison, you're going to

16    go to university; and when you graduate from university,

17    just like your mother watched her Goddaughter walk across

18    that stage, you're going to write me a letter and tell me

19    you graduated.

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  But needless to say, your success

22    going forward depends, as you know, on the choices you make

23    in life.  And we all have times in our life where we have to

24    deal with very painful realities.  And one of those painful

25    realities in most people's lives is that something has gone

1    wrong, and often times what's gone wrong is a parent.  A

2    parent has not loved you the way they should have.  They

3    have, in fact, never parented you, and that causes children

4    to suffer enormous pain.

5         But I think what you've learned is that it is okay

6    to feel the pain of that reality, but it is also okay and

7    possible to move past that.  You can set that aside.  You

8    can grieve that loss.  You can close that wound and you can

9    make something of your life, and I'm sure that's what you're

10   going to do now.

11        You know, with a criminal history of a conviction

12   for three bank robberies, I don't have to tell you, if you

13   resort to drugs and commit crime again, the future is going

14   to be grim.  So I hope that that fact also deters you in the

15   future.  But most importantly, I hope you find the strength

16   to set aside the broken part of you and find strength in

17   that broken part now and move ahead, and I wish you and your

18   family the very best.

19        THE DEFENDANT:  Thank you, Your Honor.

20        THE COURT:  Now, sir, you have the right to appeal

21   your conviction or your sentence or both, and if you wish to

22   do so, you must do so within 14 days after entry of judgment

23   in this case, which will likely be sometime next week.  And

24   if you can't afford to pay the costs of that appeal, the

25   Court will excuse those costs and pass the appeal on to the

1    court that sits above me and they will review your case.

2              At this time, Mr. Calhoun-Lopez, does the

3    Government wish to move to dismiss the remaining counts of

4    the Indictment?

5              MR. CALHOUN-LOPEZ:  We do, Your Honor.  We move to

6    dismiss Counts 4 and 5 of the Indictment.

7              THE COURT:  And those counts are dismissed.

8              Mr. Cotter, at this time do you wish to have any

9    of these submissions sealed and, if so, for how long?

10             MR. COTTER:  Your Honor, I don't believe we need

11   to seal any of the submissions.  Thank you.

12             THE COURT:  All right.  I understand that

13   Mr. Garmon is requesting voluntary surrender.  Does the

14   Government have objection?

15             MR. CALHOUN-LOPEZ:  In light of Mr. Garmon's

16   comments, Your Honor, we do not.

17             THE COURT:  All right.  Very good.  I will permit

18   voluntary surrender in this case.  And let me explain to

19   you, Mr. Garmon, how that's going to work.  I'm going to

20   give you 30 days; that is until Monday, December 10th.  You

21   may or may not be designated by then.  Mr. Cotter will

22   notify you of your designation.  So you're going to have two

23   options on December 10th.  If you have been designated to a

24   particular prison by then, you may appear at that prison

25   instead of appearing here.  You would have to appear at that

1    prison by 2 o'clock on Monday, December 10th.

2              But if you've not been designated, you must appear

3    here in Minneapolis, this is St. Paul, but you'd have to

4    appear at the Minneapolis courthouse on Monday, December

5    10th by 10:00 a.m.

6              THE DEFENDANT:  Thank you, Your Honor.

7              THE COURT:  Anything else from the Government?

8              MR. CALHOUN-LOPEZ:  No, Your Honor.

9              THE COURT:  Anything else from the defense?

10             MR. COTTER:  No, Your Honor.  Thank you.

11             THE COURT:  Very good.  Court is adjourned.

12             (Court adjourned at 10:32 a.m.)

13                         *      *      *

14

15         I, Carla R. Bebault, certify that the foregoing is

16    a correct transcript from the record of proceedings in the

17    above-entitled matter.

18             Certified by:  s/Carla R. Bebault
                              Carla Bebault, RMR, CRR, FCRR
19

20

21

22

23

24

25